IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JENNA GAUTREAUX, | § § § | |
| Plaintiff, | § § | |
| | § | Case No. 1:21-cv-1166 |
| v. | § § | |
| JAMIE MASTERS, in her official capacity, and | § § § | |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § § § | |
| Defendants. | § | |

**PLAINTIFF JENNA GAUTREAUX'S**
**ORIGINAL COMPLAINT**

Plaintiff Jenna Gautreaux files this Complaint and moves the Court for the entry of a Preliminary Injunction to remove her from the Child Protective Services Central Registry of the Texas Department of Family and Protective Services and to prohibit Defendants from continuing their retaliatory scheme against Plaintiff, as follows:

**I.       Preliminary Statement**

1.       This is a civil action for violation of, inter alia, Plaintiff's rights under 42 U.S.C. § 1983; the First, Fifth and Fourteenth Amendments to the United States Constitution, as well as her rights under the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem. Code § 110.001 *et seq.* and Article 1, Section 6 and Article 2, Section 1 of Texas Constitution.

2.       Defendants have used their power to discriminate against Plaintiff because of her religion, refused to provide her due process guaranteed under the law, and exercised powers not explicitly granted in the Texas Constitution to the executive branch of the State of Texas.  Initially, Defendant Texas Department of Family and Protective Services ("DFPS" or the "Department")

discriminated against Plaintiff and her husband in licensing them to participate in Texas' foster-to-adopt program. Later, after a baseless report of child abuse was received, DFPS personnel determined to deprive the couple of their ability to participate in the foster-to-adopt program, to prevent them from maintaining a relationship with the children they were to adopt, and to put Plaintiff on the DFPS central registry as a child abuser without any investigation, evidence or due process. Moreover, when the couple questioned the findings and the process, DFPS engaged in defamatory and other malicious acts to punish them for questioning its authority and for their religious affiliation. In fact, after a months-long investigation into the alleged child abuse and multiple hearings in the suit affecting the parent child relationship in County Court at Law of Orange County, Texas, in which the Department is the petitioner, the court determined that "[t]here was no abuse" and advised it would consider placing the children back in Plaintiff's home after she was removed from the central registry. Notwithstanding the fact that DFPS participated in all of the hearings over the course of three months and cross-examined fact witnesses and expert witnesses, it refused to recognize this ruling or to take Plaintiff off its central registry as discrimination against her for her religious beliefs.

## II.    Jurisdiction and Venue

3.      The Court has original jurisdiction pursuant to 28 U.S.C. sections 1331 and 1343 over Plaintiffs' causes of action under the Constitution of the United States and 42 U.S.C. section 1983.

4.      The Court has supplemental jurisdiction pursuant to 28 U.S.C. section 1367 over Plaintiffs' cause of action under the Texas Religious Freedom Restoration Act ("TRFRA"), Texas Civil Practice and Remedies Code Chapter 110.

5.      Declaratory and injunctive relief is authorized by 28 U.S.C. sections 2201 and 2202, Texas Civil Practice and Remedies Code section 110.005(a), and Federal Rules of Civil

2

Procedure 57 and 65.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### III.      Parties

7.      Plaintiff Jenna Gautreaux ("Plaintiff" or "Gautreaux"), an individual, is a citizen of the State of Texas.

8.      Defendant Jamie Masters ("Masters") is the Commissioner of the Texas Department of Family and Protective Services and may be served with process at 4900 North Lamar Boulevard, Austin, Texas 78751 or wherever she may be found. Masters acted under color of state law at all relevant times and for all relevant acts alleged herein.

9.      Defendant Texas Department of Family and Protective Services is an agency of the State of Texas and may be served with process by and through Commissioner Masters at 4900 North Lamar Boulevard, Austin, Texas 78751 or wherever she may be found. It is composed of the Family and Protective Services Council, the Commissioner of the Department of Family and Protective Services, other necessary officers, advisory committees, an administrative staff, and employees necessary to carry out its functions (collectively referred to herein as "DFPS"). DFPS performs functions related to, among other things, child protective services and prevention and early intervention services. DFPS acted under color of state law at all relevant times and for all relevant acts alleged herein.

### III.      Facts

10.      Section 261.002 of the Texas Family Code requires DFPS to establish and maintain a central registry of the names of individuals found by the Department to have abused or neglected a child. The same section provides that the executive commissioner of DFPS shall adopt rules necessary to carry out the requirements of Section 261.002.

3

11.     Pursuant to DFPS policy, an individual's name is added to the central registry if the Department finds there is "reason to believe" the individual committed the alleged abuse or neglect. DFPS Background Checks Handbook. 6000 Central Registry Checks for the Public.[1] The "reason to believe" standard is unique to investigations conducted by DFPS and is defined in Texas Administrative Code Rule §707.495(b) as follows: "based on a preponderance of the evidence, we conclude that abuse or neglect has occurred." The "we" in this rule refers to DFPS itself. Therefore, an individual is listed in the central registry as a perpetrator of abuse or neglect when DFPS, not a court, determines that abuse or neglect has occurred.

12.     While DFPS provides individuals with the opportunity to challenge their listing in the central registry, this process is wholly controlled by the executive branch of the State of Texas, almost entirely controlled by the Department and is available only after the Department has made a "reason to believe" determination and placed the individual in the registry. Under Texas Family Code §261.002(b)(3), the department is only required to remove an individual from the registry if the "reason to believe" finding against them is overturned by: (1) an administrative review conducted under the department's established process for reviewing complaints; (2) a review or appeal of a review conducted by the department's office of consumer affairs; or (3) a hearing or appeal before the State Office of Administrative Hearings ("SOAH").

13.     The administrative process controlled by the department lacks basic constitutional protections for plaintiffs, such as the right to confront witnesses against them. Moreover, neither the Texas Family Code nor current department policy provides for the removal of an individual from the central registry when a court finds that the individual is innocent of the allegation against them. However, department policy allows the department to deny administrative review of a

---

[1] Available at https://www.dfps.state.tx.us/handbooks/Background_Checks/Files/BC_pg_6000.asp#BC_6000.

finding of "reason to believe" if a court makes a finding consistent with the department's finding in favor of an individual placed on the registry, creating a mechanism of *res judicata* which is rigged to only apply in favor of the department. DFPS Policy Handbook 1261.1. Under current state policy and practice, an individual against whom DFPS has issued a "reason to believe" finding and placed on the registry who is ultimately exonerated by a court must successfully navigate the administrative process established by Texas Family Code §261.002(b)(3) before being removed from the registry.

14.     The Texas Legislature mandated that the department "shall by rule establish policies and procedures to resolve complaints relating to and conduct reviews of child abuse or neglect investigations conducted by the department." Tex. Fam. Code § 261.309(a). This directive includes a requirement that an individual who is determined to have abused or neglected a child be afforded the opportunity to request an administrative review of the findings of the investigation. Tex. Fam. Code § 261.309(c). An administrative review requested under Texas Family Code § 261.309 must be conducted by a department employee who was not involved in the investigation, and must "sustain, alter, or reverse the department's original findings in the investigation." *Id*.

15.     The department's rules governing this process, which it calls an "Administrative Review of Investigative Findings (ARIF)," are detailed in 40 Tex. Admin. Code § 707.505. Under these rules, the department makes it clear that it considers the ARIF "an informal review process in which the participants may appear, make statements, provide relevant written materials, and ask questions." 40 Tex. Admin. Code § 707.505(g). However, the department's rules also restrict the ability of an individual to meaningfully participate in the review process by noting that "the formal rules of evidence do not apply and the review does not include formal witness testimony." 40 Tex. Admin Code § 707.505(h). Thus, while an individual is granted some rights of participation in the

review, they are effectively barred from challenging the quality of the evidence on which the department based its findings or confronting witnesses against them.

16. Pursuant to 40 Tex. Admin. Code § 707.505(c), a requestor is not entitled to an ARIF "if a court of competent jurisdiction has already issued a ruling consistent with that specific finding." It appears, based on the department's own policy manual, that a court ruling relied upon for denying an ARIF request need not be directly related to the guilt or innocence of the requestor. DFPS Child Protective Services Handbook. 1261.1 Determining the Eligibility of a Requester.[2] Under this policy, the department may deny a request for an ARIF if "there is *another court finding* that is legally sufficient for denying the ARIF" (emphasis added). This rule, as articulated in the administrative code and interpreted by department policy, renders a court ruling on the requestor's culpability for the alleged act of abuse or neglect binding only if the ruling supports the department's finding that the requestor is guilty of the allegation. However, this is not the case in a situation where a court ruling is inconsistent with the department's finding. Where, as is the case here, a court finds that the requestor is innocent of the allegation of abuse or neglect, it is clear from existing policies and practices that the department does not believe it is bound by the court's finding. As a result, a requestor who is found innocent of wrongdoing by a court of competent jurisdiction must still go through the ARIF process to be removed from the registry. In these cases, removal is not guaranteed and the department remains free to uphold its findings, creating a conflict between the Judicial Branch's court's ruling and the Executive Branch's administrative determination that has significant ramifications for the requestor.

17. Outside of the ARIF, certain individuals may be able to challenge listing on the registry through a hearing before SOAH. This avenue is more limited, however, as the Texas

---

[2] Available at https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_1260.asp#CPS_1261_1.

Administrative Code only affords the right to a SOAH hearing to alleged perpetrators whose finding is to be released to a third party by the department without their consent or against whom the department intends to take an adverse action. 40 Tex. Admin. Code § 730.1702. The SOAH hearing differs substantially from the informal ARIF process and affords the requestor the opportunity to have their case heard before a "neutral" arbiter in a venue governed by more traditional legal procedures and in which the rules of evidence apply. See 40 Tex. Admin. Code § 155.

18.     As of November 1, 2021, the projected median amount of time a case involving the Department of Family and Protective Services will spend pending before SOAH (measured from the date filed to the date of final disposition) is 1644 days—a wait of more than 4 years. State Office of Administrative Hearings, Hearings Activity Report (HARP) March 1, 2021 - August 31, 2021 (November 1, 2021). During the time their case is pending before SOAH, the individual will remain listed on the central registry and continue to suffer the harms associated with listing.

19.     An individual who qualifies for both an ARIF and SOAH hearing is not required to complete the ARIF first and may elect to proceed directly to SOAH. Tex. Fam. Code § 261.309(e). Likewise, the department may waive the ARIF and proceed directly to SOAH for a requestor entitled to a SOAH. 40 Tex. Admin. Code § 707.505(k). The decision to bypass ARIF in favor of SOAH, however, does not impact the amount of time the requestor will have to wait before receiving a final disposition in their case.

20.     Gautreaux is a resident of Jefferson County, Texas. She and her husband applied for the Texas foster-to-adopt program in or about October of 2019. Because of the significant damage caused by Tropical Storm Imelda the previous month, their prospective foster parent training was postponed until January 2020. In the application process in place in October 2019,

DFPS requested that all applicants identify their religion. Gautreaux and her husband identified themselves as practicing members of The Church of Jesus Christ of Latter-day Saints (referred to herein as "the Church").

21.     Gautreaux and her husband attended all the courses required to become certified foster parents along with a number of other couples. Of the couples with which Gautreaux has been in closer contact, none of them faced any questions about their religion, their religious practices, or their religious background and none of them had the difficult time getting certified that Gautreaux and her husband did.

22.     After completing the training, Gautreaux and her husband underwent a home study by DFPS. The DFPS Foster and/or Adoptive Home Screening documents includes numerous references to the Gautreauxes' ties to and membership in the Church. First, the DFPS home screener noted that Gautreaux's parents had raised her with "family counsel [sic] sessions" and they "prayed together about everything." The screener wrote that Gautreaux reported that her parents had influenced her spirituality. She noted that Gautreaux's husband was adopted through a Church adoption agency. The screener remarked that one of Gautreaux's husband's coping mechanisms was "praying and reading scriptures" and that Gautreaux is distressed when she does not have "time for reading the scriptures." She wrote that Gautreaux's husband cited his parents' influence in fostering "a desire to want to know God and serve Him." The screening document contains a section titled "Religion and Culture" that analyzes the Gautreauxes' religious habits and beliefs, including daily couple-prayer, weekly church attendance, family home meetings, and once-monthly fasting. The screener remarked that the couple "stated that children in their home will never be forced to participate in their religion." She made notes about religion from her conversations with both sets of parents. The screener wrote that the Gautreauxes were married at

the "Atlanta Temple of Jesus Christ of Latter-Day Saints."

23.     DFPS's hostility toward the Gautreauxes' religion was first evident in the length of the initial interview, which lasted approximately from 5 p.m. to midnight on February 5, 2020 and continued from around 8 a.m. to 9 a.m. the next morning—approximately ten hours. Other potential foster parents' interviews lasted only an hour or two with absolutely no questions about religion. Approximately ten days after the initial interview, the Gautreauxes were told that they had to have a follow-up interview because DFPS supervisors who had reviewed the paperwork had concerns. The interviewer noted that the questions came from her supervisors and not from her.

24.     These follow-up questions exclusively concerned the Gautreauxes' religious practices and beliefs. The couple was asked whether they would encourage a foster child's religious affiliation if it were different from theirs. They were asked whether they would read books with the children about the religion of their choice. The Gautreauxes were asked if they would attend church with the children at a church of their choice. They were asked if they would support the children's religious decisions. They were asked if they would meet with the children's religious leaders. The Gautreauxes were asked if they would be involved in and research and help support their religions. They were asked if they would provide transportation to the children's church. The interviewer even apologized for the follow-up questions saying, "I'm sorry. I guess the CPS supervisor has had a problem with families in the past who didn't let the children practice their religion or forced their religion on the children." The Gautreauxes were asked if the children would be forced to pray with them or if they would be forced to go to church if they didn't want to. Gautreaux pointed out that they were only taking children 3 and under, so none of these issues would likely arise. The DFPS notes provide: "They stated that children in their home will never

9

be forced to participate in their religion or any religion and they will allow them to make up their own minds and make decisions about faith for themselves."

25.     While their classmates were certified within two months, the Gautreauxes were not certified until mid-June 2020. DFPS seemed to find odd and inconsistent reasons to put the certification off. For example, after the marathon interview and the follow-up religions interrogation, the Gautreauxes were required to go to the DFPS offices for another meeting with several DFPS supervisors lasting around an hour. No one else from the classes had this type of meeting where DFPS supervisors seemed to be probing for any reason not to certify them.

26.     As another example, on February 4, 2020 the Gautreauxes had a fire inspection of their home by the county fire inspectors and were told that they only needed one fire extinguisher for the home. However, after the meeting with the DFPS supervisors (and months after the initial home inspection), the DFPS worker told Gautreaux that they were going to require a second fire extinguisher or they could not be certified. Gautreaux pointed out that several DFPS workers had been to her house and the house was inspected for the certification and not one person said there needed to be another extinguisher. Moreover, Gautreaux pointed out that the county fire inspector said they only needed one fire extinguisher. DFPS still insisted that they had to have one or they could not have children. Another odd aspect to this delay was that the DFPS record contained the county fire inspection showing no deficiencies from February 4, 2020 and the inspection of the fire extinguisher tagged January 2020.

27.     Also, distinguishing Gautreaux from other classmates, she was constantly misled about the process for her approval and constantly delayed on the "approval process." At one time, Gautreaux was told that her home inspection was being held up by a DFPS employee who "also returned it to the writer for various corrections." The Gautreauxes were then asked for "more

information" and "more clarification" from their home study.

28.     The Gautreauxes were finally licensed as foster parents by DFPS in mid-June 2020—months after their classmates. Between August 5, 2020 and December 3, 2020, the department placed three children with the family. Carl[3] was placed on August 5, 2020, followed by Sally on October 23, and finally Sam on December 3. During their time in the Gautreauxes' care, the children thrived and were bonding with each other and their foster parents. The Gautreauxes likewise bonded with the children and desired to adopt all three in the event that they were freed for adoption. DFPS was pursuing termination of all the parental rights and have, recently, completed the termination of all the parental rights for all the children. Had the children stayed in the Gautreauxes' care, they would be in proceedings to adopt the children at this time.

29.     However, late on a Thursday night on April 8, 2021, a report was made that Gautreaux had abused one of the children. This reporter has a reputation of over-reporting abuse and testified that she did not confirm that any abuse had actually occurred, but trusted that DFPS would investigate it and find out. Before any investigation occurred, the children were immediately removed from the Gautreaux home. At a meeting shortly thereafter, DFPS determined that (1) the children were to be removed, (2) there would be "no new placements," and (3) "the agency will be closing the home once the investigation has been completed." According to the Department's own records, FPS employee Ann Andersen entered into the CPS case management system "Investigation Findings" regarding the allegations against Jenna Gautreaux with a disposition of "Reason to Believe," noting "Today is 4/8/2021."

30.     In other words, the Department determined that they would close the home and make a "reason to believe" finding before any investigation started (indeed in the same notes, it

---

[3] The names of the children have been changed in this pleading to protect their identity.

indicates the steps included calling the police, getting a medical evaluation of the children, and investigating the matter).

31.     In the notes from the DFPS meeting of supervisors, three additional "concerns" are identified about the Gautreauxes:

> Additional Concerns:
> FP (Jenna) comes from a huge family. FP (Jenna) is with Church of Latter-Day Saints, Mormon. FPs (Jenna & Andrew) have infertility problems. FPs (Jenna & Andrew) can't have children.

The first, that "(Jenna [Gautreaux]) comes from a huge family," is a common derogatory trope referring to stereotypes of Catholics or members of the Church of Jesus Christ of Latter-Day Saints. The second "concern" makes DFPS's animus explicit: "(Jenna [Gautreaux]) is with Church of Latter-Day Saints, Mormon." Under the First Amendment to the U.S. Constitution no government entity should use membership in any particular religion as a factor in any decisions, much less decisions as far-reaching as taking children in an individuals' care, denying an individual the ability to adopt those children who are up for adoption, closing an individual's home from any future placement (before any investigation), or putting Gautreaux on the child abuse registry. Yet, by DFPS's own admission, that is exactly why that happened.

32.     With an incompetent investigator who was instructed in advance on what to find to support the foregone conclusion to shut the home, on May 15, 2021, DFPS informed. Gautreaux that there was "reason to believe" that she had committed the alleged abuse/neglect and, as a result of this finding, DFPS had placed Gautreaux on the central registry. This was done without any evidence of abuse from any of the medical records, from any witness, or from any admission by Gautreaux. In other words, there was no evidence or basis for such a finding. The "investigator" never actually interviewed the abuse reporter or anyone around Gautreaux to determine if they had seen anything suspicious. Shortly thereafter, Gautreaux timely requested an ARIF challenging the

department's "reason to believe" finding.

33.    On May 18, 2021, based on these allegations, Texas Health and Human Services sent Gautreaux a letter indicating "deficiencies" found by that department relating to the anonymous report of April 8.

34.    Being listed on the central registry carries a stigma and ruins the reputation of innocent people.  It also bars them (including Plaintiff) from getting jobs that in any way involve children.  It further limits their liberty to foster, adopt, or in any way be formally associated with children.

35.    However, the most constitutionally profound impact on Gautreaux is that because of religious discrimination, she is not allowed to continue to practice her religion.  As members of the Church, the Gautreauxes participate in "callings," which are assignments made by Church leaders to allow members to serve in positions of responsibility in their local church. These callings are much more than typical volunteer positions: they are considered part of a Church member's worship and carry an added spiritual dimension. Gautreaux's calling for quite some time was to teach singing to children in her local church. Following the accusation of abuse and her placement on the central registry, however, she was removed from her position and is prohibited from serving in any other calling involving children. At several points since then, Gautreaux's local leadership has been inspired to call her to a position of responsibility over the children of the local congregation, but has been unable to because of the registry issue. Accordingly, Gautreaux has not had any calling and has not been able to practice her religion or worship in that manner. This prohibition will apply in any Church of Jesus Christ of Latter-day Saints anywhere in the world that Gautreaux may attend. Thus, DFPS's decision to uphold its "reason to believe" finding despite clear evidence and a ruling by a court of competent jurisdiction that "[t]here was no abuse" has

not only wrongfully prevented Gautreaux from being a foster parent and adoptive mother, it has also restricted her constitutionally protected freedom to freely practice her religion. (An affidavit from her local leadership attesting to these issues was provided to the Orange County court and DFPS and remains uncontested in all the records of all the hearings and appeals).

36.     Following the removal of the children from Gautreaux's home, the court with jurisdiction over the children, County Court at Law No. 1 in Orange County, Texas, allowed the Gautreauxes to continue to participate in hearings concerning the placement of the children and the allegations that led DFPS to remove the children. There were three months of hearings, with DFPS's full participation in introducing evidence, cross-examining witnesses, and arguing to the court. There was lengthy testimony from lay and expert witnesses—all of which indicated that there is no actual proof or evidence of any abuse whatsoever. Not surprisingly, at the end of the last hearing, on July 8, 2021, the presiding judge, the Honorable Mandy White-Rogers, found that there was absolutely no evidence of abuse in this case. In fact, DFPS was so adamant that the court find some evidence of abuse, it kept arguing for that finding, causing the court a half a dozen or dozen times to respond that there was "no evidence of abuse." Indeed, the court declared that it would allow the boys to go back to Gautreaux's home when she was removed from the central registry.

37.     It is clear from the record that Gautreaux never abused or neglected the children placed in her care by DFPS. Furthermore, the record shows that children thrived while in the care of the Gautreauxes, but have since been traumatized by placement changes resulting from their wrongful removal from the Gautreaux home.

38.     In communication with DFPS about getting off the central registry, Gautreaux's then-attorney told DFPS that it was bound by the decision of the Orange County court (*res judicata*

or claim preclusion) and that it was estopped from contesting the judicial finding. The attorney also showed (again) how there was no actual evidence—physical or testimonial—of abuse. Indeed, the attorney showed DFPS affidavits from a dozen people who were around Gautreaux and in her home for tens of hours a week who never saw any signs of aggression or abuse. DFPS was given expert witness reports from a neonatal nurse and a well-respected forensic psychiatrist finding that there was no abuse, and that Gautreaux was not the type of person who would engage in abuse of any kind. However, on August 9, 2021, one month after the hearing in which the Orange County court ruled that abuse did not occur and that it would be willing to place children back with Gautreaux once she was removed from the central registry, DFPS—in direct contradiction of the court that heard and weighed the credibility of all witnesses—sent Gautreaux a certified letter notifying her that the administrative review upheld the "reason to believe" finding against her. The timing of the department's decision to uphold the "reason to believe" finding against Gautreaux was made as part of the discrimination and in retaliation for the Gautreauxes having questioned the bureaucrats' authority or power. It was in direct response to the Orange County court's statements at the July 8th hearing and for the purpose of preventing the judge from carrying out her promise to place the children back with the Gautreauxes (where she had no doubt they would be safe).

39.     Upon receipt of the letter informing her of DFPS's decision to uphold the "reason to believe" finding, Gautreaux made a request for a due process hearing before an administrative law judge of the State Office of Administrative Hearings (SOAH).

40.     On August 31, 2021, the Texas Health and Human Services Commission (HHSC) sent a letter acknowledging receipt of their request for a due process hearing. Rather than providing a date for the hearing, however, the letter stated that "due to the number of currently pending cases,

there may be some delay before a hearing is scheduled." As mentioned above, SOAH is experiencing a significant backlog of cases involving DFPS. By its own estimate, the projected median number of days for a DFPS case at SOAH currently sits at 1644—a wait of more than 4 years. Moreover, it appears less that there are a large number of people appealing DFPS findings, but rather that hearings are simply and arbitrarily delayed.

41.    DFPS failed and refused to follow the Orange County court's ruling, in a Suit Affecting the Parent Child Relationship filed by the Department and in which DFPS participated, that there was no abuse, take Gautreaux off the registry, and allow her to adopt the children she had bonded with. Moreover, when DFPS was told that improperly keeping Gautreaux on the registry was denying her practice of religion, they responded essentially by stating that they did not know what she did on the weekends, implying they did not care about restrictions they had imposed on her religious liberty.

42.    The Fifth and Fourteenth Amendments to the United States Constitution guarantee due process of law whenever someone is denied "life, liberty, or property." While the United States Supreme Court has found that specific procedures to satisfy due process will vary depending on the circumstances and the importance of the right placed in jeopardy, it has held that timely notice and the opportunity to be heard before an impartial tribunal are essential elements that must be satisfied in order to prevent unfair or erroneous deprivations of liberty. *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972). The Supreme Court has also found that the opportunity to be heard must be provided within a meaningful time. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

43.    Thus far Gautreaux has been denied even the most basic due process required by the United States Constitution. Under DFPS's central registry procedures, she was required to challenge the "reason to believe" finding made against her with the very agency that made the

finding in the first place. Given the response from SOAH, it is unclear when Gautreaux will have her first opportunity to have her case heard before a "neutral" tribunal, but it is reasonable to assume, based on that tribunal's own reports, that this opportunity is years away. By this time, it is likely that the children with whom Gautreaux shared a developing bond and who were wrongfully removed from her home will have already been adopted. This, of course, is the best-case scenario as it is also possible that the children could remain in foster care for these years and be subjected to additional trauma that easily could have been avoided.

### IV.    Causes of Action

### COUNT 1
### FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT
### OF THE UNITED STATES CONSTITUTION

44.    Plaintiff incorporates and realleges each prior paragraph as if fully set out herein.

45.    DFPS's adoption and enforcement of its policy to treat consistent court rulings as binding but disregard inconsistent court rulings places a substantial burden on Plaintiff's free exercise of her religious beliefs. Plaintiff is prevented from actively practicing her religion because she is forbidden from worshiping within her calling and is physically excluded from spaces within her place of worship. Because it imposes this burden, DFPS's policy does not afford any accommodation of Plaintiff's sincerely held religious beliefs.

46.    DFPS's policy is not the least restrictive means of, or rationally related to, achieving DFPS's interest in promoting safe and healthy families and protecting children and vulnerable adults from abuse, neglect, and exploitation.

### COUNT 2
### TEXAS RELIGIOUS FREEDOM RESTORATION ACT
### TEX. CIV. PRAC. & REM. CODE § 110.001 ET SEQ.

47.    Plaintiff incorporates and realleges each prior paragraph as if fully set out herein.

48.     DFPS's adoption and enforcement of its policy to treat consistent court rulings as binding but disregard inconsistent court rulings places a substantial burden on Plaintiff's free exercise of her religious beliefs, as set forth above. Plaintiff is prevented from actively practicing her religion because she is forbidden from worshiping within her calling and is physically excluded from spaces within her place of worship. Because it imposes this burden, DFPS's policy does not afford any accommodation of Plaintiff's sincerely held religious beliefs.

49.     DFPS's policy is not the least restrictive means of, or rationally related to, achieving DFPS's interest in promoting safe and healthy families and protecting children and vulnerable adults from abuse, neglect, and exploitation.

50.     DFPS's decision to keep Plaintiff on the central registry pending an over four-year wait for an administrative hearing despite the ruling by a court of competent jurisdiction that "[t]here was no abuse" is imminent and has already occurred. Plaintiff was not informed by DFPS of its decision beforehand and did not otherwise have knowledge of the decision in time to reasonably provide the notice required by Texas Civil Practice and Remedies Code section 110.006. Accordingly, she is permitted to bring this action. *See* Tex. Civ. Prac. & Rem. Code § 110.006(b).

## COUNT 3
## DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION

51.     Plaintiff incorporates and realleges each prior paragraph as if fully set out herein.

52.     Plaintiff has exercised the constitutional right to actively practice her religion, as set forth above.

53.     DFPS's adoption and enforcement of its policy to treat consistent court rulings as binding but disregard inconsistent court rulings places a substantial burden on Plaintiff's free

exercise of her religious beliefs, as set forth above. Plaintiff is prevented from actively practicing her religion because she is forbidden from worshiping within her calling and is physically excluded from spaces within her place of worship.

54.     DFPS's policy does not bear more than a reasonable relation to its interest in promoting safe and healthy families and protecting children and vulnerable adults from abuse, neglect, and exploitation.

55.     DFPS's adoption and enforcement of its policy deprives plaintiff of her liberty interest, secured by the Substantive Due Process Clause of the Fourteenth Amendment, in actively practicing her religion.

## COUNT 4
## ARTICLE 1, SECTION 6, AND ARTICLE 2, SECTION 1 OF THE TEXAS CONSTITUTION

56.      DFPS's adoption and enforcement of its policy unfairly and without due process deprives plaintiff of her religious liberty interest, secured by Article 1, Section 6 of the Texas Constitution.

57.     DFPS's adoption and enforcement of its policy is not authorized by an express provision of the Texas Constitution. Exceptions to the constitutionally mandated separation of powers are never to be implied; they must be expressly permitted by the Constitution itself and the Department's exercise of the powers properly attached to the Judicial Branch thus violate Article II, Section 1 of the Texas Constitution.

## ATTORNEYS' FEES AND COSTS

58.     Plaintiffs are entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. section 1988.

59.     Plaintiff additionally is entitled to an award of reasonable attorneys' fees and costs

pursuant to Texas Civil Practice and Remedies Code section 110.005(a)(4).

### V.   Conclusion and Prayer for Relief

For these reasons, Plaintiff Jenna Gautreaux respectfully request the following relief:

a.   a declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202 declaring that DFPS's adoption and enforcement of its policy violates the First and Fourteenth Amendments to the United States constitution;

b.   a declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202 declaring that DFPS's adoption and enforcement of its policy violates TRFRA;

c.   a preliminary and permanent injunction pursuant to Federal Rule of Civil Procedure 65 and Texas Civil Practice and Remedies Code section 110.005 removing Plaintiff from the DFPS central registry;

d.   a declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202 declaring that DFPS's adoption and enforcement of its policy violates Article 1, Section 6 of the Texas Constitution.

e.   a declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202 declaring that DFPS's adoption and enforcement of its policy violates Article 2, Section 1 of the Texas Constitution.

f.   an order awarding Plaintiff compensatory damages for her pecuniary and nonpecuniary losses pursuant to Texas Civil Practice and Remedies Code section 110.005;

g.   an order awarding Plaintiff her reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. section 1988 and Texas Civil Practice and Remedies Code section 110.005;

h.   an order awarding Plaintiff her expert fees incurred in bringing this action pursuant to 42 U.S.C. section 1988;

i.   an order awarding Plaintiff her reasonable court costs and expenses incurred in bringing this action pursuant to Texas Civil Practice and Remedies Code section 110.005;

j.   prejudgment interest on all amount awarded at the maximum legal rate until final judgment;

k.   post-judgment interest at the highest amount allowed by law, on all amounts awarded until paid;

l.   the costs of court; and

m.  for all other and further relief as this Court deems just and proper.

Respectfully submitted,

By: _____/s/ Geoffrey Berg_____
Geoffrey Berg
Texas Bar No. 00793330
gberg@bergplummer.com
Mike Schneider
Texas Bar No. 24006221
mschneider@bergplummer.com
Kathryn E. Nelson
Texas Bar No. 24037166
knelson@bergplummer.com
**BERG PLUMMER JOHNSON & RAVAL, LLP**
3700 Buffalo Speedway, Suite 1150
Houston, Texas 77098
713-526-0200 (tel)
832-615-2665 (fax)

**Counsel for Plaintiff Jenna Gautreaux**